Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| ADMINISTRACIÓN DE DESARROLLO SOCIOECONÓMICO DE LA FAMILIA (ADSEF); DEPARTAMENTO DE LA FAMILIA REPRESENTADO POR EL DEPARTAMENTO DE JUSTICIA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO **RECURRIDOS** v. PLATINUM ADVISORS CORPORATION; PEDRO J. FIGUEROA EN CALIDAD DE PRESIDENTE **PETICIONARIOS** | KLCE202400928 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina Caso Núm. CA2023CV04028 Sobre: Cobro de Dinero; Reclamación de Pago de lo Indebido |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, y el Juez Rodríguez Flores.

Pagán Ocasio, juez ponente

# SENTENCIA

En San Juan, Puerto Rico, a 20 de septiembre de 2024.

## I.

El 28 de agosto de 2024, Platinum Advisors Corporation (Platinum o la parte peticionaria) presentó una *Petición de Certiorari* en la que solicitó que revoquemos una *Resolución* emitida, notificada y archivada digitalmente en autos por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI o foro primario) el 15 de julio de 2024.[1] En el dictamen, el TPI declaró No Ha Lugar una *Moción en solicitud de sentencia sumaria* promovida por Platinum para que se desestimara una *Demanda* sobre cobro de dinero presentada en su contra por la Administración de Desarrollo Socioeconómico de la Familia (ADSEF o parte recurrida).

---

[1] Apéndice de la *Petición de Certiorari*, Anejo 1, págs. 001-013.

Número Identificador
SEN2024_____

El 30 de agosto de 2024, emitimos una *Resolución* en la que le concedimos a la parte recurrida un término de diez (10) días para exponer su posición sobre los méritos del recurso.

El 13 de septiembre de 2024, la ADSEF, representada por la Oficina del Procurador General, radicó un *Escrito en cumplimiento de Resolución* en el que solicitó que denegáramos expedir el auto solicitado.

Contando con el beneficio de la comparecencia de las partes, damos por perfeccionado el recurso y, en adelante, pormenorizamos los hechos procesales pertinentes a la atención de la *Petición de Certiorari*.

**II.**

El caso de marras tiene su génesis el 21 de diciembre de 2023 cuando la ADSEF presentó una *Demanda* sobre cobro de dinero y en reclamo de pago de lo indebido en contra de Platinum y el señor Pedro J. Figueroa Costa (señor Figueroa Costa), presidente de dicha compañía.[2] En ella, solicitó que, en virtud de unas facturas alegadamente no pagadas por la parte peticionaria, se les ordenara a estos a pagar $75,997.00 a la parte recurrida, más intereses, costas y honorarios de abogado. Para sustentar ese petitorio, alegó lo siguiente:

1. La ADSEF administra el Programa (Temporary Assistance for Needy Families) TANF. Este programa tiene como principio fundamental que las familias terminen la dependencia en las ayudas gubernamentales y logren su autosuficiencia mediante el empleo. Los fondos para cubrir los gastos de funcionamiento del programa provienen de resoluciones conjuntas del presupuesto general y de aportaciones federales.
2. El 1 de octubre de 2010, la ADSEF contrató con PAC para el manejo de casos de los participantes del programa.
3. Para cobrar por los servicios ofrecidos por PAC, la entidad utiliza un formulario de factura mensual suministrado por la ADSEF. En la primera parte de este formulario, las agencias delegadas anotaban los casos activos al comenzar el mes. A esta partida se le suman los casos referidos nuevos y los que completaron justa causa durante el periodo facturado. Por otro lado, se restan los casos cerrados, los referidos a justa causa, y los pendientes de intercambio de información con la oficina

---

[2] Íd., Anejo 4, págs. 024-030.

local. Estos casos se identifican con estatus de participación 3. A cambio del manejo de los participantes en el programa, ADSEF le paga $83.33 mensuales por cada participante.

4. En las facturas presentadas para pago por los servicios prestados por la PAC, esta no le restó del total de casos activos a un total de 457 participantes con estatus de participación 3. Además, incluyó en las futuras a 455 participantes adicionales a los indicados en los formularios provistos por ADSEF.

5. Esta situación produjo un pago indebido de $75,997.00 a PAC por 912 participantes facturados en exceso durante el periodo del 1 de octubre de 2010 al 30 de septiembre del 20211 [sic].

6. El 20 de noviembre de 2015, ADSEF le envío una primera factura al cobro por esta deuda. El 14 de noviembre de 2017, le remitió una segunda factura sin obtener resultados.

7. El 21 de septiembre de 2022 el abogado que subscribe envió otra carta interpelativa al cobro cual fue recibida por el aquí demandado. No obstante, su acreencia no ha sido satisfecha, por lo que la deuda objeto de este pleito a la fecha de esta demanda es líquida, vencida y exigible.[3]

El 6 de marzo de 2024, el señor Figueroa Costa radicó una *Moción de desestimación* en la que solicitó que se desestimara la *Demanda* en cuanto a él porque no exponía reclamación alguna que justificara la concesión de un remedio.[4] A su entender, la *Demanda* no incluyó alegación en su contra, limitándose a mencionarlo como presidente y único accionista de Platinum. Luego de que la parte recurrida se expresara sobre la posible desestimación, el 12 de abril de 2024, el TPI emitió una *Sentencia Parcial* en la que desestimó con perjuicio la *Demanda* en contra del señor Figueroa Costa.[5] Sobre esa determinación, la ADSEF solicitó reconsideración[6], la cual fue declarada No Ha Lugar por el TPI en una *Resolución* emitida el 26 de abril de 2024[7].

El 7 de marzo de 2024, Platinum presentó una *Moción en solicitud de sentencia sumaria* en la que solicitó al TPI que dictara sentencia sumaria a su favor y desestimara con perjuicio la

---

[3] Íd., págs. 025-027.
[4] Íd., Anejo 5, págs. 031-035.
[5] Íd., Anejo 14, págs. 141-145. Notificada y archivada digitalmente en autos el 15 de abril de 2024.
[6] Íd., Anejo 16, págs. 149-154.
[7] Íd., Anejo 17, págs. 155-156. Notificada y archivada en autos el 29 de abril de 2024.

*Demanda.*[8] En ella, argumentó que la ADSEF incumplió con el *Reglamento sobre deudas no contributivas existentes a favor del Estado Libre Asociado de Puerto Rico*, Reglamento Núm. 44 del Departamento de Hacienda, Reglamento Núm. 7564 del 27 de agosto de 2008 (Reglamento Núm. 7564) al no suspender todo procedimiento de cobro ante la objeción de la parte peticionaria, analizar, adjudicar y notificar su decisión dentro del término establecido. Asimismo, arguyó que no existía evidencia para sustentar la acreencia reclamada por la parte recurrida.

Según alegó, no existía controversia en cuanto a los siguientes hechos:

1. La parte demandante es el Estado Libre Asociado de Puerto Rico y su Administración de Desarrollo Socioeconómico de la Familia (en adelante ADSEF), una división adscrita al Departamento de la Familia (en adelante Departamento) cual es la agencia gubernamental responsable de llevar a cabo los programas del Estado Libre Asociado. **Véase párrafo número uno (1) de la Demanda, en su sección III. (PARTES).**
2. La parte demandada Platinum Advisors Corporation es una entidad organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con número de registro 123101. **Véase párrafo número dos (2) de la Demanda, en su sección III. (PARTES).**
3. La ADSEF administra el Programa (*Temporary Assistance for Needy Families)* TANF. Este programa tiene como principio fundamental que las familias terminen la dependencia en las ayudas gubernamentales y logren su autosuficiencia mediante el empleo. Los fondos para cubrir los gastos de funcionamiento del programa provienen de resoluciones conjuntas del presupuesto general y de aportaciones federales. **Véase párrafo número uno (1) de la Demanda, en su sección IV. (HECHOS DEL CASO).**
4. En octubre de 2010, la ADSEF contrató con Platinum para el manejo de casos de los participantes del programa. **Véase párrafo número dos (2) de la Demanda, en su sección IV. (HECHOS DEL CASO).**
5. El 20 de noviembre de 2015, ADSEF le envío a Platinum la Primera Factura era por una alegada deuda [la deuda reclamada en la demanda]. **Véase la primera oración del párrafo número seis (6) de la Demanda, en su sección IV. (HECHOS DEL CASO). Véase además la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 6 Véase además copia de Primera Factura incluida como Anejo 1 de esta Solicitud.**
6. Platinum recibió la primera factura de ADSEF el 7 de diciembre de 2015 y presentó su objeción a la misma, por escrito, el 14 de diciembre de 2015. **Véase la Declaración**

---

[8] Íd., Anejo 6, págs. 036-110.

**Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 7. Véase además copia de la Objeción de Platinum a la Primera Factura incluida como Anejo 2 de esta Solicitud.**

7. El Demandante nunca contestó la Objeción de Platinum a la Primera Factura. **Véase la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 8.**

8. El Demandante nunca notificó la decisión tomada a Platinum sobre la objeción a la primera Factura. **Véase la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 9.**

9. El 27 de mayo de 2021, el Demandante le remitió la Segunda Factura a Platinum. Véase Declaración [d]el Presidente de Platinum incluida como Anejo 5 de esta Solicitud, específicamente en el párrafo 10.

10. El 2 de junio de 2021 el entonces abogado de Platinum envió la objeción de Platinum y nunca tuvo respuesta del Demandante **Véase la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 11. Véase además la Objeción de Platinum inclua como Anejo 4 de esta Solicitud.**

11. El Demandante nunca contestó la objeción de Platinum a la Segunda Factura. **Véase la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 12.**

12. El Demandante nunca notificó la decisión tomada a Platinum sobre la objeción a la Segunda Factura. **Véase la Declaración Jurada del Presidente de Platinum, incluida como Anejo 5 de este Demanda, en específico a su párrafo 13.**

Para apoyar su solicitud, incluyó: (1) la primera factura; (2) la objeción a la primera factura; (3) la segunda factura; (4) la objeción a la segunda factura; y (5) una declaración jurada suscrita por el señor Figueroa Costa.

El 27 de marzo de 2024, la ADSEF radicó una *Moción al amparo de la Regla 36.6 de Procedimiento [Civil]* en la que solicitó que se le permitiera realizar descubrimiento de prueba antes de presentar una contestación a la *Moción en solicitud de sentencia sumaria* de la parte peticionaria.[9]

El 2 de abril de 2024, Platinum presentó una *Oposición a moción al amparo de la Regla 36.6 del demandante y reiterando solicitud de sentencia sumaria* en la que se opuso a permitir

---

[9] Íd., Anejo 9, págs. 127-129.

descubrimiento de prueba entre las partes previo a la adjudicación de su solicitud de sentencia sumaria.[10]

Ese mismo día, la ADSEF radicó una *Moción solicitando término par[a] replicar*, en la que solicitó la oportunidad de replicar a la oposición de Platinum a su solicitud de descubrimiento de prueba.[11]

El 11 de abril del 2024, el TPI emitió una *Resolución y Orden* en la que declaró Con Lugar la solicitud de la ADSEF para permitir descubrimiento de prueba previo a presentar su oposición a la solicitud de sentencia sumaria.[12] En otra *Orden*, emitida el mismo día, declaró académica la petición de término para replicar.[13]

El 31 de mayo de 2024, la ADSEF presentó una *Moción en oposición a sentencia sumaria* en la que solicitó al TPI que declarara No Ha Lugar la *Moción en solicitud de sentencia sumaria* y, en consecuencia, le ordenara a la parte peticionaria a contestar la *Demanda*.[14] En ella, arguyó que Platinum no objetó las facturas dentro de los términos dispuestos en el Reglamento Núm. 7564 y, en contraste, la ADSEF remitió facturas al menos cuatro (4) veces antes de instar la *Demanda*. Por ello, alegó que no hacía falta paralizar la facturación a la parte peticionaria y correspondía recobrar los fondos públicos cobrados en exceso.

Sobre los hechos en controversia, planteó lo siguiente:

1. Queda en controversia que Platinum recibió la primera factura del ADSEF el 7 de diciembre de 2015 y presentó su objeción a la misma, por escrito, el 14 de diciembre de 2015. Véase **Exhibit 2,** Primera factura (Modelo SC 724) con fecha del 20 de noviembre de 2015. Véase además, **Exhibit 3,** Acuse de recibo firmado el 28 de noviembre de 2015. La fecha del recibo de la primera misiva de Platinum fue recibida en las oficinas de ADSEF el 18 de diciembre de 2015, es decir 20 días después del recibo

---

[10] Íd., Anejo 12, págs. 134-137.
[11] Entrada Núm. 20 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[12] Apéndice de la *Petición de Certiorari*, Anejo 13, págs. 138-140. Notificada y archivada digitalmente en autos al día siguiente.
[13] Entrada Núm. 24 del expediente digital del caso en el SUMAC. Notificada y archivada digitalmente en autos al día siguiente.
[14] Apéndice de la *Petición de Certiorari*, Anejo 19, págs. 159-217.

del Modelo SC 724. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶3-5.

2. Se controvierte que el Director de Finanzas de ADSEF nunca contestó la Objeción de Platinum a la primera factura. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶3-8.
3. Se controvierte que el Director de Finanzas de ADSEF nunca notificó la decisión tomada a Platinum sobre la objeción a la primera factura. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶3-8.
4. Se controvierte que ADSEF le remitió la Segunda Factura a Platinum el 27 de mayo de 2021. La misiva enviada por funcionarios de finanzas de ADSEF en esta fecha corresponde a una tercera factura al cobro. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶9-12.
5. Se controvierte que el 2 de junio de 2021 el entonces abogado de Platinum envió la objeción de Platinum y nunca tuvo respuesta de Demandante. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶13-15.
6. Queda en controversia que el Demandante nunca contestó la objeción de Platinum a la Segunda Factura. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶13-15.
7. Queda en controversia que el Demandante nunca notificó la decisión tomada por Platinum sobre la objeción a la Segunda Factura ya que ADSEF nunca recibió una objeción a la Segunda Factura notificada el 14 de noviembre de 2017. Véase **Exhibit 4,** Declaración Jurada del Director de Finanzas de ADSEF, ¶¶13-15.[15]

En lo pertinente, sobre los hechos que no estaban en controversia, admitió que: (1) el 1 de octubre de 2010, la ADSEF contrató con Platinum el manejo de casos de los participantes del TANF; y (2) que el 20 de noviembre de 2015, la ADSEF envió la primera factura de cobro y el 14 de noviembre de 2017, la segunda factura y no obtuvo resultados. Por último, en apoyo de su oposición, incluyó: (1) un *Informe de auditoría* preparado por la Oficina del Contralor; (2) una de las facturas; (3) un recibo de entrega del correo del *United States Postal Service* a Platinum; y (4) una declaración jurada suscrita por el Director de Finanzas de la ADSEF, el señor Carlos Martínez Colón.

El 10 de junio de 2024, Platinum radicó una *Moción al amparo de la Regla 8.4 de Procedimiento Civil* en la que solicitó que no se adjudicara la solicitud de sentencia sumaria hasta que la parte peticionaria no replicara a la oposición de la ADSEF.[16]

---

[15] Íd., págs. 173-175.
[16] Entrada Núm. 35 del expediente digital del caso en el SUMAC.

El 13 de junio de 2024, Platinum presentó una *Réplica a la oposición del demandante a la solicitud de sentencia sumaria de Platinum Advisors Corporation* en la que reiteró sus planteamientos sobre la solicitud de sentencia sumaria, solicitó una determinación de temeridad en contra de la ADSEF por presentar la *Demanda* a sabiendas de su incumplimiento con el Reglamento Núm. 7564, *supra*, y argumentó que la oposición de la parte recurrida era inmeritoria y no se apoyaba en la prueba sometida.[17] En primer lugar, arguyó que solo hubo tres gestiones de cobro, en vez de cuatro, según demuestra la declaración jurada provista por la ADSEF. En segundo lugar, alegó que Platinum objetó las dos facturas recibidas oportunamente, mientras que la otra nunca fue recibida.

El 2 de julio de 2024, Platinum radicó una *Moción en solicitud de adjudicación de sentencia sumaria y otros extremos* en la que solicitó que se diera por sometida la solicitud de sentencia sumaria, que se atendiera en sus méritos y que el descubrimiento de prueba se suspendiera en el ínterin.[18]

El 15 de julio de 2024, el TPI emitió, notificó y archivó la *Resolución* recurrida en la que declaró No Ha Lugar la *Moción en solicitud de sentencia sumaria* promovida por Platinum.[19] A su juicio, la *Demanda* no debía ser desestimada o adjudicada en contra de la ADSEF porque la deuda reclamada excedía los $5,000.00 y, por ello, no se tenía que agotar el remedio administrativo, según estatuido en el Reglamento Núm. 7564, *supra*. En consecuencia, ordenó la continuación de los procedimientos y le concedió a Platinum un término para contestar la *Demanda*.

---

[17] Apéndice de la *Petición de Certiorari*, Anejo 20, págs. 218-260.
[18] Íd., Anejo 24, págs. 275-278.
[19] Íd., Anejo 1, págs. 001-013.

En su dictamen, el foro primario formuló los siguientes hechos, que a su entender, no estaban en controversia:

1. La parte demandante es el Estado Libre Asociado de Puerto Rico y su Administración de Desarrollo Socioeconómico de la Familia (en adelante ADSEF), una división adscrita al Departamento de la Familia (en adelante Departamento) cual es la agencia gubernamental responsable de llevar a cabo los programas del Estado Libre Asociado.
2. La parte demandada Platinum Advisors Corporation es una entidad organizada bajo las leyes del Estado Libre Asociado de Puerto Rico, con número de registro 123101.
3. La ADSEF administra el Programa (Temporary Assistance for Needy Families) TANF. Este programa tiene como principio fundamental que las familias terminen la dependencia en las ayudas gubernamentales y logren su autosuficiencia mediante el empleo. Los fondos para cubrir los gastos de funcionamiento del programa provienen de resoluciones conjuntas del presupuesto general y de aportaciones federales.
4. En octubre de 2010, la ADSEF contrató con Platinum para el manejo de casos de los participantes del programa.
5. El 20 de noviembre de 2015, ADSEF le envío a Platinum la Primera Factura era por una alegada deuda de $75,997.00.
6. Platinum recibió la primera factura de ADSEF el 7 de diciembre de 2015 y presentó su objeción a la misma, por escrito, el 14 de diciembre de 2015.
7. El Demandante nunca contestó la Objeción de Platinum a la Primera Factura.
8. El Demandante nunca notificó la decisión tomada a Platinum sobre la objeción a la primera Factura.
9. El 27 de mayo de 2021, el Demandante le remitió la Segunda Factura a Platinum.
10. El 2 de junio de 2021 el entonces abogado de Platinum envió la objeción de Platinum y nunca tuvo respuesta del Demandante.
11. El Demandante nunca contestó la objeción de Platinum a la Segunda Factura.
12. El Demandante nunca notificó la decisión tomada a Platinum sobre la objeción a la Segunda Factura.[20]

El 24 de julio de 2024, Platinum presentó una *Solicitud de reconsideración* en la que solicitó al TPI que reconsiderara la *Resolución* y, en cambio, dictara sentencia desestimando con perjuicio la *Demanda*.[21]

El 29 de julio de 2024, el TPI emitió una *Resolución* en la que declaró No Ha Lugar la reconsideración solicitada por Platinum.[22]

---

[20] Íd., págs. 004-005.
[21] Íd., Anejo 2, págs. 014-021.
[22] Íd., Anejo 3, págs. 022-023. Notificada y archivada digitalmente en autos al día siguiente.

El 18 de agosto de 2024, Platinum radicó una *Contestación a demanda* en la que, además de negar las alegaciones sustantivas de la *Demanda,* reiteró su solicitud de desestimación con perjuicio.[23]

Inconforme con la denegatoria de su solicitud de sentencia sumaria, Platinum presentó el recurso de epígrafe y le imputó al foro primario la comisión del siguiente error:

> Erró el TPI al denegar la solicitud de sentencia sumaria de Plantinum [sic] al determinar que por la alegada deuda exceder los $5,000, el Estado demandante podía abandonar el procedimiento administrativo de cobro *sin culminarlo,* y así instar el pleito del epígrafe, cuando el propio Estado había iniciado y el cobro bajo el Reglamento Núm. 44,[24] y que Patinum cumplió a cabalidad.

Es su contención que el manejo por la ADSEF de sus objeciones oportunas le despojó ilegalmente del debido proceso de ley, el cual incluía una determinación del Director de Finanzas de la agencia por escrito, notificada por correo certificado con acuse de recibo, y una vista administrativa, según dispuesto en el Reglamento Núm. 7564, *supra.* Al respecto, arguye que, como los reclamos de cobro en su contra fueron iniciados al amparo de dicho Reglamento – evidenciado por la utilización del formulario SC-724, exclusivo de ese estatuto – una vez Platinum objetó la deuda, la ADSEF tenía que suspender todo proceso de cobro, analizar la objeción, adjudicarla y notificar su decisión en un término de veinte (20) días, pero eso no ocurrió. Según plantea, dicho Reglamento no permite que la ADSEF obvie sus disposiciones, especialmente el derecho de la parte peticionaria a recibir una determinación del Director de Finanzas de la agencia y una vista administrativa tras su desacuerdo. Ese incumplimiento fue craso y quedó demostrado según los hechos que el TPI resolvió que estaban incontrovertidos, arguye.

---

[23] Íd., Anejo 25, págs. 279-284.

[24] La parte recurrente incluyó la siguiente nota al calce: "El Reglamento Núm. 7564 del 27 de agosto de 2008, conocido como el Reglamento Núm. 44, *Deudas No Contributivas Existentes a Favor del Estado Libre Asociado de Puerto Rico* (Reglamento Núm. 44), dispone el procedimiento a seguir por el ELA para el cobro de deudas no contributivas.

A su vez, aduce que, después de todos los años transcurridos desde la remisión de las facturas, la ADSEF no presentó información en apoyo de su reclamo. Por último, recordó que, ante la presentación de la *Demanda* en su contra, Platinum levantó la incuria como defensa afirmativa.

El 13 de septiembre de 2024, la ADSEF presentó un *Escrito en cumplimiento de Resolución* en el que solicitó que deneguemos la expedición del auto de *Certiorari*, en aras de permitir la continuación de los procedimientos ante el TPI hasta dilucidar la reclamación de cobro de fondos públicos pagados en exceso.

En síntesis, para apoyar esa posición, la parte recurrida argumenta que: (1) el Reglamento Núm. 7564, *supra*, no prohíbe el inicio de la reclamación judicial, aunque no se haya notificado una determinación final, ni realizado una vista administrativa; (2) a través del procedimiento judicial, a Platinum se le han garantizado todas las exigencias del debido proceso de ley de forma más abarcadora de lo que correspondería en el proceso administrativo que solicita; (3) debido a esas garantías, cualquier defecto procesal ocurrido durante el trámite administrativo fue subsanado por las múltiples oportunidades que ha tenido Platinum para defenderse del caso en la vía judicial; (4) la determinación del foro primario no fue contraria a derecho, ni denotó un abuso de discreción que motive la intervención de esta Curia; (5) la controversia presentada se trata de un asunto estrictamente de derecho que no requiere de pericia administrativa; y (6) la parte peticionaria no quedó en un estado de indefensión por el mero hecho de que no recibiera una determinación final.

Por último, también arguye que, incluso si se determinara que la ADSEF incumplió con el procedimiento requerido, nada impedía al TPI relevar al Estado de agotar los remedios administrativos porque obligarle a culminarlos le causaría daño irreparable al

interés público de protección al erario y no se justificaría en balance de intereses.

Estando perfeccionado el caso, analizamos la normativa jurídica aplicable a la controversia ante nos.

**III.**

**A.**

El auto de *certiorari* es un remedio procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. ***Medina Nazario v. McNeil Healthcare LLC***, 194 DPR 723, 728 (2016). Véase, además, ***IG Builders et al v. BBVAPR***, 185 DPR 307, 337 (2012). A diferencia de una apelación, el tribunal de superior jerarquía tiene la facultad de expedir el auto de *certiorari* de forma discrecional. ***Rivera Figueroa v. Joe's European Shop***, 183 DPR 580, 596 (2011).

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1,[25] establece las instancias en las que le foro revisor posee autoridad para expedir un auto de *certiorari* sobre materia civil. ***Scotiabank v. ZAF Corp., et al.***, 202 DPR 478 (2019). La citada regla delimita el alcance jurisdiccional del Tribunal de Apelaciones para atender un recurso de *certiorari* que se trate sobre la revisión de dictámenes

---

[25] Esta Regla dispone que:

El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios (sic), anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

Cualquier otra resolución u orden interlocutoria expedida por el Tribunal de Primera Instancia podrá ser revisada en el recurso de apelación que se interponga contra la sentencia sujeto a lo dispuesto en la Regla 50 sobre los errores no perjudiciales.

interlocutorios del Tribunal de Primera Instancia. ***Mun. Caguas v. JRO Contruction, Inc.***, 201 DPR 703 (2019).

Si el asunto sobre el cual versa el recurso de *certiorari* está comprendido en una de las instancias establecidas en la Regla 52.1 de Procedimiento Civil, *supra*, debemos pasar entonces a un segundo escrutinio. El mismo se caracteriza por la discreción que ha sido conferida al Tribunal de Apelaciones para autorizar, expedir y adjudicar en sus méritos el caso.

Con el fin de que podamos ejercer de manera sabia y prudente nuestra facultad discrecional, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R.40, establece los criterios que debemos tomar en consideración al atender una solicitud de expedición de un auto de *certiorari.* [26]

**B.**

La jurisdicción ha sido definida como "el poder o autoridad de un tribunal para considerar y decidir casos y controversias". ***Shell v. Srio. Hacienda,*** 187 DPR 109, 122 (2012). Reiteradamente, nuestro Tribunal Supremo ha expresado que los tribunales tienen siempre la obligación de ser celosos guardianes de su propia jurisdicción, toda vez que sin jurisdicción no están autorizados a entrar a resolver los méritos de un recurso. Íd., págs. 122-123. En

---

[26] Esta Regla dispone lo siguiente:

El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

consecuencia, los asuntos de jurisdicción son materia privilegiada y deben ser resueltos con preferencia. *Fuentes Bonilla v. ELA,* 200 DPR 364, 372 (2018). Así, cuando un tribunal no tiene autoridad para atender el recurso, solo tiene jurisdicción para así declararlo y desestimar el caso sin entrar en los méritos de la controversia. *Mun. de San Sebastián v. QMC Telecom,* 190 DPR 652, 660 (2014).

De ordinario, la falta de jurisdicción posee las siguientes características: (1) no es susceptible de ser subsanada; (2) las partes no pueden conferírsela voluntariamente al tribunal, ni este puede arrogársela; (3) conlleva la nulidad de cualquier dictamen emitido; (4) impone a los tribunales el deber obligatorio de auscultar su propia jurisdicción; (5) impone a los tribunales apelativos el deber de examinar la jurisdicción del foro inferior; y (6) puede presentarse en cualquier etapa del procedimiento, a instancia de partes o por el propio tribunal. *Beltrán Cintrón et al. v. ELA et al.,* 204 DPR 89, 101-102 (2020) (citando a *Fuentes Bonilla v. ELA,* supra, págs. 372-373); *González v. Mayagüez Resort & Casino,* 176 DPR 848, 855 (2009).

### C.

El mecanismo procesal de la sentencia sumaria surge de la Regla 36.1 de Procedimiento Civil, *supra,* R. 36.1. El propósito de esta regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales que no requieren ventilarse en un juicio plenario. *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018); *Bobé et al. v. UBS Financial Services,* 198 DPR 6, 20 (2017); *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 430 (2013). Mediante este mecanismo, una parte puede solicitar que el tribunal dicte sentencia sumaria de la totalidad de la reclamación o de parte de esta. De esta forma, se promueve la descongestión de calendarios, así como la

pronta adjudicación de controversias cuando una audiencia formal resulta en una dilación innecesaria. *Vera v. Dr. Bravo*, 161 DPR 308, 331-332 (2004).

Ahora bien, el mecanismo de sentencia sumaria solo está disponible para la disposición de aquellos casos que **sean claros**; cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda; y que solo reste por disponer las controversias de derecho existentes. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994). Asimismo, al evaluarse los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia, consciente en todo momento de que su determinación puede privar a una de las partes de su día en corte. *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020). De la mano con este precepto del debido proceso de ley, el juzgador deberá utilizar el principio de liberalidad a favor del opositor de la moción, lo cual implica que, de haber dudas sobre la existencia de controversias de hechos materiales, entonces deberán resolverse a favor de la parte que se opone a la moción de sentencia sumaria. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 138 (2015); *Ramos Pérez v. Univisión*, 178 DPR 200, 216-217 (2010).

Para prevalecer en una moción de sentencia sumaria, su promovente tiene que establecer su derecho con claridad y debe demostrar que no existe controversia en cuanto a ningún hecho material, o sea, ningún elemento de la causa de acción. *Meléndez González et al. v. M. Cuebas*, supra, pág. 110. Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo. *Ramos Pérez v. Univisión*, supra, pág. 213. La controversia sobre el hecho material debe ser real. Íd. A saber:

> [U]na controversia no es siempre real o sustancial, o genuina. La controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través

de un juicio plenario. La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada sólo puede negarse si la parte que se opone a ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor. Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria. Íd., págs. 213-214, *citando a* P. E. Ortiz Álvarez, *Hacia el uso óptimo de la sentencia sumaria*, 3 (Núm. 2) Forum 3, 8 (1987).

En suma, deberá demostrar que: (1) no es necesario celebrar una vista; (2) el demandante no cuenta con evidencia para probar algún hecho sustancial; y (3) procede como cuestión de derecho. R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil,* 2017, pág. 317.

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real en cuanto a algún hecho material a la controversia y, en ese sentido, no es cualquier duda la suficiente para derrotar la solicitud. **Meléndez González et al. v. M. Cuebas**, supra. En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales. Íd., citando a **Ramos Pérez v. Univisión**, supra, pág. 214. De esta manera, central entre las responsabilidades de la parte promovida se encuentra que debe puntualizar los hechos propuestos que pretende controvertir, haciendo referencia a la prueba específica que sostiene su posición. **León Torres v. Rivera Lebrón,** supra. Es decir, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". Íd. De esta forma, no puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa. **SLG Zapata-Rivera v. JF Montalvo**, supra; **Ramos Pérez v. Univisión**, supra, pág. 215; **Cruz Marcano v. Sánchez Tarazona**, 172 DPR 526, 550 (2007). Lo anterior, además, es cónsono con los requerimientos

establecidos por las Reglas de Procedimiento Civil, *supra*, en lo pertinente a este mecanismo procesal.

En síntesis, ha quedado establecido que los tribunales no podrán dictar sentencia sumaria en cuatro situaciones: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando existan alegaciones afirmativas en la demanda sin refutar; (3) cuando surja de los propios documentos que acompañan la moción en solicitud de sentencia sumaria que existe una controversia sobre algún hecho material o esencial; o (4) cuando no proceda como cuestión de Derecho. ***Oriental Bank v. Perapi***, 192 DPR 7, 26-27 (2014).

Entretanto, desde el punto de vista procesal, la Regla 36.4 de Procedimiento Civil, *supra*, R. 36.4, impone que, si en virtud de una moción de sentencia sumaria no se dicta sentencia sobre la totalidad del pleito, no se concede todo el remedio solicitado o se deniega la moción, y resulta necesario celebrar un juicio, entonces es obligatorio que el tribunal resuelva la moción realizando una determinación: (1) de los hechos esenciales y pertinentes sobre los que no hay controversia sustancial; (2) de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos; (3) de hasta qué extremo la cuantía de los daños u otra reparación no está en controversia; y (4) ordenando los procedimientos ulteriores que entienda justos, lo cual podría incluir una vista evidenciaria limitada a los asuntos en controversia. En dicho caso, al celebrarse el juicio se considerarán probados los hechos especificados, se procederá en conformidad y, a base de las determinaciones realizadas en virtud de esta regla, se dictarán los remedios que correspondan, si alguno. Íd.

De otra parte, en ***Meléndez González et al. v. M. Cuebas***, supra, el Tribunal Supremo delineó el estándar que el Tribunal de

Apelaciones debe utilizar para revisar una denegatoria o una concesión de una moción de sentencia sumaria.

En primer lugar, reafirmó que el Tribunal de Apelaciones se encuentra en la misma posición que el TPI al momento de revisar solicitudes de sentencia sumaria, siendo su revisión una *de novo* y teniendo la obligación de regirse por la Regla 36 de Procedimiento Civil, *supra*, y los criterios que la jurisprudencia le exige al foro primario. Íd., pág. 118. Asimismo, deberá examinar el expediente de la manera más favorable hacia la parte promovida, llevando a cabo todas las inferencias permisibles a su favor. Íd. Ahora bien, reconoció que el foro apelativo está limitado, toda vez que no podrá tomar en consideración evidencia que las partes no presentaron ante el foro primario, ni podrá adjudicar los hechos materiales en controversia. Íd.

En segundo lugar, prescribió que el Tribunal de Apelaciones deberá revisar que tanto la moción en solicitud de sentencia sumaria, como la oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra*. Íd.

En tercer lugar, mandató que, ante la revisión de una sentencia dictada sumariamente, el Tribunal de Apelaciones deberá revisar si en realidad existen hechos materiales en controversia y, de haberlos, estará obligado a exponer específicamente cuáles hechos materiales están en controversia y cuáles no, en cumplimiento con la Regla 36.4 de Procedimiento Civil, *supra*, R. 36.4. Íd.

En cuarto lugar, dispuso que, si encuentra que los hechos materiales realmente no están en controversia, entonces el Tribunal de Apelaciones deberá revisar *de novo* si el foro primario aplicó correctamente el Derecho. Íd., pág. 119.

**D.**

En nuestro ordenamiento administrativo, la autoridad de las agencias para aprobar reglas o reglamentos surge directamente de su ley habilitadora, la cual define y delimita la extensión de su jurisdicción. ***Benítez Nieves v. ELA et. al.,*** 202 DPR 818, 827-828 (2019) (citando a D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 3ra ed., Colombia, Ed. Forum, 2013, págs. 121–123 y 161). De ahí que el campo de acción de las agencias para promulgar reglas o reglamentos está delimitado por su ley habilitadora o estatuto orgánico.

En ese contexto, también ha quedado reiteradamente establecido que las agencias administrativas están obligadas a observar estrictamente las reglas que ellas mismas promulgan, en virtud de sus facultades delegadas y en aras de limitar su jurisdicción, y carecen de arbitrio o discreción para cumplirlas o reconocer los derechos contenidos en ellas. Íd., pág. 828; ***Torres v. Junta Ingenieros,*** 161 DPR 696, 712, 715 (2004). Es decir, el campo de acción de una agencia administrativa para aplicar sus reglas o reglamentos está delimitado por las propias reglas o reglamentos. En consecuencia, una vez la agencia adopta una norma administrativa, debe cumplirla y aplicarla en la manera que fue concebida, respetando los propósitos, objetivos y política pública que la motivaron. Íd.; ***Torres v. Junta Ingenieros,*** supra, pág. 713; ***T-JAC, Inc. v. Caguas Centrum Limited,*** 148 DPR 70, 81 (1999). Así, las agencias están vedadas de actuar de manera arbitraria, de cambiar sus reglamentos y de establecer reglas nuevas, por más poderes que se les hayan delegado. Íd.; ***Asoc. Fcias. Com. v. Depto. de Salud,*** 156 DPR 105, 136 (2002). En fin, no pueden aplicar caprichosa o arbitrariamente sus reglamentos a casos particulares. Íd. Más aún, deben velar por que los requisitos estatutarios

establecidos en su reglamento sean cumplidos. ***T-JAC, Inc. v. Caguas Centrum Limited,*** supra.

Pertinente a este caso, el 27 de agosto de 2008, el Departamento de Hacienda promulgó el Reglamento Núm. 7564, *supra*, para establecer las normas a seguir por las agencias administrativas para cobrar deudas atrasadas y para transigir, disponer administrativamente, cancelar o liquidar deudas no contributivas. Art. II del Reglamento Núm. 7564, *supra*, pág. 2. Este le aplica a las personas naturales o jurídicas que reciban pagos indebidos por servicios prestados a entidades gubernamentales o por beneficios de programas recibidos indebidamente. Art. III del Reglamento Núm. 7564, *supra*.

Entre sus disposiciones, el Art. IV del Reglamento Núm. 7564, *supra*, pág. 2-4, define "deuda" como "cualquier deuda no contributiva que se origina como resultado de las operaciones o funciones de la agencia tales como: cheques rechazados, multas administrativas, pagos indebidos o beneficios del gobierno recibidos por personas sin derecho a los mismos". También, fija el significado de "pagos indebidos" como aquellos:

> [D]esembolsos realizados por la agencia para el pago de bienes o servicios que no fueron recibidos o se pagaron en exceso. De igual modo, aplica a los desembolsos a los cuales el recipiente no tenía derecho parcial o totalmente o que no tienen causa legítima porque no se observaron los procedimientos legales y/o administrativos. Íd.

Ahora bien, el Art. V del Reglamento Núm. 7564, *supra*, págs. 4-7, establece las reglas en cuanto a las gestiones de cobro; el Art. VI, las normas pertinentes a las objeciones al pago de la deuda por el alegado deudor; el Art. VIII, las pautas relativas a deudas de $5,000.00 o menos; y el Art. IX, las directrices aplicables a deudas que excedan de $5,000.00, casos a enviarse al Secretario de Justicia.

En lo pertinente, el Art. V del Reglamento Núm. 7564, *supra,* dispone que se emitirá el *Modelo SC 724, Factura al cobro* para efectuar la gestión de cobro inicial, concediéndole al deudor treinta (30) días para hacerlo y enviándose copia al Director de Finanzas de la agencia. Asimismo, prescribe que luego de transcurridos diez (10) días laborables después de la fecha concedida al deudor sin que se reciba el pago o se inicie un plan de pago, el Director de Finanzas de la agencia le enviará con acuse de recibo al deudor moroso el *Modelo SC 1071, Segunda gestión de cobro de deudas no contributivas* en el que se le indicará la fecha de vencimiento, la naturaleza e importe de la deuda y los recargos aplicables, si alguno.

Entretanto, el Art. VI del Reglamento Núm. 7564, *supra,* págs. 7-9, dispone palmariamente lo siguiente:

A. Si el deudor levanta alguna objeción al pago de la deuda dentro de los **15 días laborables** siguientes al recibo del Modelo SC 724, la agencia detendrá toda acción de cobro sobre la misma. En los casos en que se envíe una segunda gestión de cobro, el deudor tendrá **10 días laborables** para objetar la misma. De no recibirse notificación alguna, se continuará con el trámite del caso.

B. Cuando el deudor objete el pago de la deuda, el Director de Finanzas estudiará el caso y notificará por escrito al deudor la decisión tomada, dentro de los siguientes **20 días laborables** siguientes a la fecha de recibo de la objeción. De existir circunstancias extraordinarias que requieran estudios o análisis prolongados, el Director de Finanzas podrá prorrogar su decisión por **otros 10 días laborables**. No obstante, deberá notificar el hecho por escrito al deudor. Una vez tomada la decisión final, le informará la misma al deudor. La determinación de la prórroga y la decisión final deberán enviarse al deudor por correo certificado con acuse de recibo. En la notificación de decisión final el Director de Finanzas indicará el término que tiene el deudor para apelar. Además, en dicha notificación le advertirá que de no recibirse su apelación dentro de ese término se continuará con el caso.

C. Del deudor no estar de acuerdo con la decisión, informará sus razones por escrito al Director de Finanzas, dentro de los **15 días laborables** siguientes a partir del recibo de la determinación. De no recibirse la apelación del deudor dentro del término establecido, se continuará con el trámite del mismo de acuerdo con las disposiciones de este Reglamento. Será responsabilidad del deudor asegurar y verificar el recibo de su comunicación.

D. Si el deudor somete una apelación, el Director de Finanzas de la agencia, procederá como sigue:
  1. En los casos de deudas de $5,000.00 o menos, le dará una cita al deudor, para discutir el asunto.
  2. Cuando la deuda exceda de $5,000.00, concederá al deudor una vista administrativa conforme al

> reglamento establecido por la agencia para estos casos.
>
> E. Si la deuda excede de $5,000.00, el Director de Finanzas someterá el expediente del <u>caso con su determinación</u> y los pormenores del mismo al Secretario de Justicia, para que proceda de acuerdo con la Ley que establece el procedimiento de cobro por la vía judicial. Si la deuda no excede de $5,000.00, someterá el mismo al Área del Tesoro del Departamento de Hacienda. Íd. (Ennegrecido en el original y subrayado nuestro).

En cuanto a las deudas de $5,000.00 o menos, el Art. VIII del Reglamento Núm. 7564, *supra*, págs. 11-13, prescribe que la agencia, además de los datos incluidos en el expediente del caso, evaluará la deuda y considerará como factores: la imposibilidad de cobrar la deuda del caudal hereditario, en casos de muerte del deudor; la prescripción de la deuda; y el resultado de la entrevista con el deudor, si asistió, o de las comunicaciones recibidas de su parte. Según este estudio, el Director de Finanzas recomendará al jefe de la agencia si deberá transigirse la deuda o disponerse de ella administrativamente. El resto del referido Artículo dispone el procedimiento para ello.

Asimismo, el Art. IX del Reglamento Núm. 7564, *supra*, págs. 13-15, dispone el proceso a seguir para las deudas que exceden los $5,000.00, casos a enviarse al Secretario de Justicia. Lógicamente, este Artículo aplica a las instancias en las que, en virtud del inciso (E) del Art. VI del Reglamento Núm. 7564, *supra*, la agencia opta por acudir a la vía judicial y no por el procedimiento administrativo, según requiere el inciso (D) del mismo Artículo cuando un alegado deudor apela u objeta una deuda de este tipo, lo cual requiere la concesión de una vista administrativa. En esos casos, el referido Artículo mandata expresamente lo siguiente:

> A. La agencia deberá tomar en consideración los siguientes factores para determinar si el caso debe someterse al Secretario de Justicia:
> 1. Importe de la deuda debe exceder de $5,000.00
> 2. Si la deuda prescribió.
> 3. Muerte del deudor e imposibilidad de cobrar la deuda del caudal hereditario
> 4. Si el deudor tiene solvencia económica y dispone de bienes embargables como para hacer ejecutable la sentencia que se obtenga del caso, o por el contrario,

si el deudor es insolvente y no tiene bienes embargables.

B. Una vez la agencia determine que se debe proceder judicialmente, enviará el expediente del caso a la Oficina de Litigios Generales del Departamento de Justicia con todas las copias firmadas y certificadas como copia fiel y exacta. Si la agencia determina lo contrario, deberá enviar un informe explicativo al Secretario de Justicia y retendrá el expediente del caso.

C. El Secretario de Justicia una vez inicie el cobro por la vía judicial, notificará a la agencia el número de título y del caso, el Tribunal donde se entabló el procedimiento judicial y la sentencia dictada por el Tribunal. También, le notificará si se logró cobrar la deuda judicialmente, ya sea porque el deudor efectuó el pago o se acogió a un plan de pago. El Secretario de Justicia devolverá el expediente del caso a la agencia de origen, una vez concertado el plan de pago u obtenida la sentencia favorable, para que ésta reciba los pagos o realice la gestión de ejecución.

D. Cuando no se logre cobrar la deuda, el Secretario de Justicia devolverá el expediente del caso a la agencia de origen acompañado de un informe en el cual se le indicará las razones por las cuales no pudo cobrarse la deuda.

E. Cuando la agencia reciba dicho informe, hará las anotaciones en sus registros. Si aún no han transcurrido **cinco años** desde que la sentencia es final y firme, la agencia conservará el expediente hasta que se cumpla dicho periodo. Una vez se cumpla dicho período, enviará el caso al Área del Tesoro del Departamento de Hacienda para que la declare incobrable. En el caso de cheques rechazados una vez se declare incobrable, se enviará a la División de Conciliación del Área del Tesoro para que se haga el ajuste correspondiente.

F. El Secretario de Hacienda, luego de evaluar las recomendaciones efectuadas por el Secretario de Justicia, determinará si declara la deuda incobrable. Notificará por escrito a la agencia la acción tomada para que proceda a eliminar la deuda del registro de deudas pendientes de cobro. Íd. (Ennegrecido en el original).

Por último, el inciso (A) del Art. X del Reglamento Núm. 7564, *supra*, pág. 15, dispone que:

[e]l Director de Finanzas utilizará todos los medios a su alcance para cobrar la deuda. Se asegurará de realizar las gestiones de cobro en la forma más efectiva y de acuerdo a las disposiciones de este Reglamento. El Departamento de Hacienda analizará y verificará dichas gestiones y podrá, según sea el caso, señalar responsabilidades si determina que no se realizaron las gestiones con la diligencia debida, de acuerdo con este Reglamento.

**E.**

Por otro lado, como norma de autolimitación judicial, se ha adoptado la doctrina de agotamiento de remedios administrativos, la cual determina "la etapa en que un tribunal de justicia debe intervenir en una controversia que se ha presentado inicialmente ante un foro administrativo." ***S.L.G. Flores-Jiménez v. Colberg***,

173 DPR 843, 851 (2008) (citando a ***Asoc. Pesc. Pta. Figueras v. Pto. Del Rey***, 155 DPR 906, 916-917 (2001)); ***Mun. de Caguas v. AT & T***, 154 DPR 401, 407 (2001). Mediante esta, los tribunales se abstienen de revisar una actuación de una agencia hasta tanto la persona afectada agote todos los remedios administrativos que tiene disponible, de manera que la decisión administrativa refleje la posición final de la entidad estatal. ***Procuradora Paciente v. MCS***, 163 DPR 21, 35 (2004). De ordinario, esta norma aplica a los casos en los que una parte que instó o tiene instada una acción ante una agencia gubernamental o algún ente administrativo recurre al tribunal sin antes haber culminado todo el trámite que tenía disponible en ese foro. ***Municipio de Caguas v. AT & T***, supra, pág. 408. O sea, se invoca para cuestionar una acción judicial promovida por un litigante que originalmente participó en un procedimiento administrativo y luego recurrió al foro judicial teniendo todavía remedios administrativos disponibles. Íd. Lógicamente, la aplicación de esta doctrina requiere, por un lado, la preexistencia de un procedimiento administrativo que comenzó, pero no finalizó porque la parte acudió al foro judicial; mientras que, por el otro, es necesario que aún exista alguna fase del procedimiento que la parte debe agotar. Íd., pág. 409.

En cuanto a su razón de ser, la doctrina de agotamiento de remedios administrativos pretende <u>evitar que se presente un recurso ante los tribunales sin que la agencia administrativa haya tomado una determinación final en el asunto.</u> ***Hernández, Romero v. Pol. de P.R.***, 177 DPR 121, 136 (2009). De esta forma, también se fomenta que los organismos utilicen y apliquen su conocimiento especializado al dirimir las controversias. ***S.L.G. Flores-Jiménez v. Colberg***, supra, pág. 852.

Estatutariamente, la doctrina de agotamiento de remedios está codificada en la Sección 4.2 de la *Ley de Procedimiento*

*Administrativo Uniforme*, Ley Núm. 38 de 2017, según enmendada, 3 LPRA sec. 9672, (LPAU). En ella, se establece que la parte adversamente afectada por una determinación administrativa, una vez haya agotado todos los remedios provistos por la agencia o el organismo administrativo apelativo correspondiente, podrá presentar una solicitud de revisión judicial ante el Tribunal de Apelaciones. Asimismo, prescribe que la revisión judicial será el recurso exclusivo para revisar en los méritos una decisión administrativa, sea de naturaleza adjudicativa o informal.

Ahora bien, la exigencia de agotar todos los remedios no es un principio de aplicación inflexible. ***S.L.G. Flores-Jiménez v. Colberg***, supra, pág. 853; ***Asoc. Pesc. Pta. Figueras v. Pto. del Rey***, supra, pág. 917. En virtud de ello, la Sección 4.3 de la LPAU, dispone que se podrá eximir a una parte de agotar remedios ante la agencia cuando: (1) el remedio sea inadecuado; (2) el requerir su agotamiento resulta en un daño irreparable al promovente; (3) en un balance de intereses, no se justifica agotar los remedios; (4) cuando se alegue una violación sustancial de los derechos constitucionales; (5) sea inútil agotar los remedios por la dilación excesiva en el procedimiento; (6) cuando la agencia administrativa carezca de jurisdicción; o (7) el asunto es estrictamente de derecho y resulta innecesaria la pericia administrativa. ***S.L.G. Flores-Jiménez v. Colberg***, supra, pág. 852.

**F.**

Otra norma de autolimitación judicial es la doctrina de jurisdicción primaria, la cual atiende la interrogante de qué foro posee la facultad <u>inicial</u> de adjudicar y entender un asunto. ***Beltrán Cintrón et al. v. ELA et al.,*** supra, pág. 102; ***Colón Rivera, et al., v. ELA***, 189 DPR 1033, 1057 (2013). En el contexto administrativo, esta doctrina de origen jurisprudencial pretende determinar si le corresponde a la agencia administrativa o al tribunal intervenir

primero en la controversia. ***Colón Rivera, et al., v. ELA,*** supra. Mediante esta, se busca armonizar la labor adjudicativa de los foros administrativo y los judiciales. Íd., citando a ***Guzmán y otros v. E.L.A.,*** 156 DPR 693, 711 (2002). Igualmente, se persigue el objetivo de "mantener un adecuado balance y distribución de poder y tareas entre las agencias administrativas y el poder judicial". Íd., citando a ***Vélez Ramírez v. Romero Barceló***, 112 DPR 716, 722 (1982).

Operativamente, la jurisdicción primaria consiste en dos vertientes: (1) la jurisdicción primaria concurrente; y (2) la jurisdicción primaria exclusiva. ***Beltrán Cintrón et al. v. ELA et al.,*** supra. La primera tiene lugar cuando la ley permite que una reclamación se presente en la agencia o en el tribunal; la segunda, cuando la ley establece que el foro administrativo será el foro inicial y exclusivo para entender la reclamación. Íd.

En la primera vertiente, tanto el foro judicial como el administrativo tienen jurisdicción para atender el caso, pero se le cede primacía a la agencia por su especialización y conocimiento sobre el asunto de la reclamación. Íd., pág. 103. En términos generales, en esta vertiente será el promovente quien tomará la decisión sobre el foro al cual acudirá J. A. Echevarría Vargas, <u>Derecho Administrativo Puertorriqueño</u>, 5ª ed. rev., San Juan, Ed. Situm, 2023, pág. 85. En el contexto administrativo, se ha establecido como regla general que los jueces deben aplicar esta norma de abstención en casos en que el peritaje de la agencia es indispensable para resolver la controversia. ***Beltrán Cintrón et al. v. ELA et al.,*** supra, pág. 103. (citas omitidas). Esto suele aplicarse especialmente cuando existen cuestiones de hechos que requieren del ejercicio de discreción adjudicativa de la agencia o de la aplicación del conocimiento especializado que estas poseen. Íd.

En la segunda vertiente, la propia ley o estatuto establece que un ente en particular – en este contexto, la agencia administrativa –

será el foro con jurisdicción para examinar la reclamación en primera instancia. Íd. Por esa razón, la jurisdicción primaria exclusiva, también conocida como jurisdicción estatutaria, no tiene origen jurisprudencial, sino legislativo. Íd. Y es que, para que la norma de jurisdicción primaria sea de aplicación, "deberá ser categóricamente concedida en la ley". Echevarría Vargas, *op. cit.*, pág. 81. Por eso, "cuando una ley expresamente le confiere la jurisdicción a una agencia administrativa, o ello surge del mismo por implicación necesaria, los tribunales no tendrán autoridad para dilucidar la controversia en primera instancia". Íd.; ***S.L.G. Semidey Vázquez v. ASIFAL***, 177 DPR 657, 677 (2009); ***Clases A, B y C v. PRTC***, 183 DPR 666, 686 (2011); ***Junta de Dir. Cond. Montebello v. Fernández***, 136 DPR 223, 230 (1994). La jurisdicción primaria exclusiva conferida al organismo "no admite ningún otro medio de solución, ajuste o prevención". ***Rodríguez Rivera v. De León Otaño***, 191 DPR 700, 709 (2014) (citando a D. Fernández Quiñones, *op. cit.*, pág. 575). Sin embargo, no debe soslayarse que nunca se le podrá privar a los tribunales de jurisdicción original en aquellos casos donde se planteen derechos constitucionales y se demuestre que existen posibilidades reales de prevalecer. Echevarría Vargas, *op. cit.*, pág. 82; ***First Fed. Savs. v. Asoc. de Condómines***, 114 DPR 426 (1983). Es decir, la jurisdicción primaria del foro administrativo puede ceder ante un planteamiento de derechos constitucionales. ***Beltrán Cintrón et al. v. ELA et al.,*** supra, pág. 104. Por eso, la reivindicación de derechos constitucionales puede reclamarse directamente ante el TPI, sin que la agencia tenga jurisdicción original. Íd. Empero, debe tenerse en mente que esto no significa que una simple alegación de violación a estos derechos tiene el efecto de excluir el foro administrativo. Íd. Es importante que se demuestre que la acción administrativa: (1) constituye una gestión inútil e inefectiva y que no ofrece un remedio adecuado; o (2) que podría causar un daño irreparable e inminente.

Íd., pág. 104-105, citando a **First Fed. Savs. v. Asoc. de Condómines,** supra, pág. 438.

Consiguientemente, la norma de jurisdicción primaria no es una camisa de fuerza y ante ciertas situaciones se ha reconocido su inaplicabilidad. **Consejo Titulares v. Gómez Estremera et al.,** 184 DPR 407, 430 (2012) (citando a **Ortiz v. Panel F.E.I.,** 155 DPR 219, 246 (2001). Específicamente no aplica cuando "[l]a naturaleza de la causa de acción presentada y el remedio solicitado destacan que no se presentan cuestiones de derecho que exijan el ejercicio de discreción y de peritaje administrativo, es decir, cuando la cuestión que se plantea sea puramente judicial". Íd., págs. 430-431, citando a D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2ª ed. rev., Bogotá, Ed. Forum, 2001, págs. 443-444.

### G.

En nuestro ordenamiento, la doctrina de incuria se ha definido como la "dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad". **Alonso Piñero v. UNDARE, Inc.,** 199 DPR 32, 53 (2017) (citando a **Comisión Ciudadanos v. G. P. Real Property,** 173 DPR 998, 1019-1020 (2008)). Mediante esta, existen situaciones en las que la inacción de una parte por un largo periodo de tiempo y la legítima confianza de la otra parte pudiera impedir que se provea el remedio solicitado mediante reclamos tardíos. **Consejo Titulares v. Ramos Vázquez,** 186 DPR 311, 341 (2012).

Según ha reconocido nuestro Tribunal Supremo, la razón de ser de la doctrina de incuria surge de "la máxima de que la equidad auxilia a quien se mantiene vigilante en el reclamo de sus derechos y no a quien duerme sobre la corriente sin mostrar excusas

razonables para ello". *Alonso Piñero v. UNDARE, Inc.,* supra, págs. 53-54, citando a *Consejo Titulares v. Ramos Vázquez,* supra. Esto responde a que una reclamación tardía opera en detrimento de la parte contraria, especialmente cuando se tuvo amplia oportunidad para reclamar diligentemente sus derechos. Íd., pág. 54, citando a *Consejo Titulares v. Ramos Vázquez,* supra.

No obstante, la aplicación de la doctrina de incuria no opera automáticamente por el mero transcurso del tiempo, sino que requiere considerar: (1) si existe alguna justificación para la demora; (2) el perjuicio que esta acarrea; y (3) el efecto sobre los intereses privados o públicos involucrados. *Puerto Rico Asphalt v. Junta,* 203 DPR 734, 743 (2019); *Alonso Piñero v. UNDARE, Inc.,* supra, pág. 54; *Consejo Titulares v. Ramos Vázquez,* supra; *Comisión Ciudadanos v. G. P. Real Property,* supra, pág. 1020. Ese análisis debe hacerse a la luz de los hechos y circunstancias particulares de cada caso. *Consejo Titulares v. Ramos Vázquez,* supra, citando a *Pérez, Pellot v. J.A.S.A.P.,* 139 DPR 588, 599-600 (1995).

**IV.**

En el caso de marras, el TPI emitió una *Resolución* en la que rechazó dictar sentencia sumaria desestimando la causa de acción del caso de epígrafe en contra de Platinum y, en consecuencia, ordenó la continuación de los procedimientos. A su juicio, la *Demanda* no debía ser desestimada porque la deuda reclamada excedía $5,000.00 y, según lo estatuido en el Reglamento Núm. 7564, *supra,* la ADSEF no tenía que agotar remedios administrativos.

En el dictamen, el foro primario determinó que no estaba en controversia que: (1) la ADSEF contrató con Platinum el manejo de casos de los participantes en el TANF; (2) el 20 de noviembre del 2015, la ADSEF envió a Platinum una primera factura por una alegada deuda de $75,997.00; (3) el 7 de diciembre de 2015,

Platinum recibió la primera factura y, siete (7) días después, presentó su objeción; (4) <u>la ADSEF nunca contestó la objeción, ni notificó a Platinum decisión alguna sobre ella</u>; (5) el 27 de mayo de 2021, la ADSEF remitió a Platinum una segunda factura; (6) el 2 de junio de 2021, Platinum envió una objeción sobre dicha factura, <u>respecto a la cual nunca recibió respuesta</u>; y (7) <u>la ADSEF nunca contestó la objeción de Platinum a la segunda factura, ni notificó la decisión tomada sobre ella</u>. Adviértase que el TPI no realizó determinación alguna sobre cuáles hechos sí estaban en controversia e impedían resolver el caso de forma sumaria.

En desacuerdo con la determinación, Platinum argumenta que la ADSEF le despojó del debido proceso de ley al no respetar el Reglamento Núm. 7564, *supra,* negándose a proveerle una determinación del Director de Finanzas de la agencia, ni una vista administrativa. Cimienta ese planteamiento en que los hechos incontrovertidos, según determinados por el TPI, apoyan una conclusión de que la ADSEF incumplió crasamente con su propio Reglamento. Según aduce, los hechos demuestran que la agencia inició el esfuerzo de cobro de dinero al amparo del referido Reglamento, utilizando un formulario incluido en este, pero que, pese a la objeción oportuna de Platinum, incumplió con lo requerido. Esto es, no analizó la objeción, no la adjudicó, no notificó decisión alguna dentro de veinte (20) días y no celebró una vista tras el desacuerdo de la parte peticionaria. A esto añade que, casi trece (13) años después de la emisión de la primera factura, la ADSEF no ha presentado información para apoyar su reclamación. Asimismo, plantea que debemos aplicar la doctrina de incuria, la cual Platinum levantó como defensa afirmativa para impedir el ejercicio de la acción de cobro.

En apoyo de la *Resolución* recurrida, la ADSEF arguye que el Reglamento Núm. 7564, *supra,* no impide el inicio de la reclamación

judicial, aunque no se haya notificado una determinación final, ni realizado una vista administrativa. Entretanto, alega que, por la vía judicial, se han respetado todas las exigencias del debido proceso de ley, incluso más abarcadoramente de lo que hubiese sido bajo el foro administrativo que Platinum solicita. Por ello, esboza que cualquier defecto procesal del trámite administrativo quedó subsanado, sin que la parte peticionaria haya sufrido un estado de indefensión. A su vez, plantea que la determinación del TPI debe sostenerse por no ser contraria a derecho, ni constituir un abuso de discreción. Por el contrario, expone que, como la controversia se trata de un asunto de estricto derecho, no se requiere de la pericia administrativa particular de la ADSEF. En la alternativa, aduce que, aunque se determinara que la ADSEF incumplió con su propio reglamento, el TPI podía relevarle de agotar los remedios administrativos, toda vez que no hacerlo implicaría un daño irreparable al interés público que reviste los asuntos relacionados al cobro indebido de fondos públicos.

Tras un análisis objetivo, sereno y cuidadoso del expediente, en correcta práctica adjudicativa apelativa, resolvemos que el TPI erró al emitir la *Resolución* recurrida. Las disposiciones del Reglamento Núm. 7564, *supra*, son prístinamente claras y no permiten la presentación de la *Demanda* promovida por la ADSEF sin antes culminarse el procedimiento administrativo que comenzó al enviar dos facturas de cobro a Platinum. Las agencias administrativas, como la ADSEF, están obligadas a respetar y seguir sus normas y reglamentos según promulgados. Este caso no es la excepción, puesto que no estamos ante alguno de los requisitos que permiten preterir la doctrina de agotamiento de remedios administrativos. Aún más, el tiempo transcurrido entre el envío de la primera factura, la remisión de la segunda factura, las oportunas objeciones de la parte peticionaria y la radicación de la *Demanda* sin

que la ADSEF le comunicara trámite adicional alguno a Platinum no favorece eximirle de cumplir con su propio reglamento y no agotar los remedios disponibles.

Según pormenorizamos previamente, el Reglamento Núm. 7564, *supra*, veda el proceder asumido por la ADSEF en este caso. De acuerdo con el Art. VI del referido Reglamento, *supra*, cuando el deudor levanta alguna objeción al pago de una deuda mayor de $5,000.00 dentro de los quince (15) días laborables siguientes al recibo del formulario SC-724, <u>la agencia detendrá toda acción de cobro</u>, el Director de Finanzas estudiará el caso y notificará su decisión al deudor por escrito dentro de los veinte (20) días laborables siguientes al recibo de la objeción, pudiéndose prorrogar dicho término por diez (10) días laborables adicionales. Tomada la decisión final, esta <u>se le informará al deudor por correo certificado con acuse de recibo</u>, incluyéndose el término que tiene para apelar y advirtiéndole que se continuará con el caso de no recibirse su apelación. Dispone el Artículo VI que, de haberse recibido la decisión del Director de Finanzas, Platinum hubiese tenido quince (15) días laborables a partir de su recibo para informar sus razones para no estar de acuerdo. De haberse sometido una apelación, el Director de la agencia <u>debía concederle una vista administrativa</u>, a celebrarse conforme al reglamento de la agencia para esta.

Hasta ahí, según los hechos que el TPI determinó que no estaban incontrovertidos, sustentados en el expediente, la ADSEF no cumplió con esas disposiciones. Respecto a la primera factura, luego de enviada[27] y recibida[28], Platinum la objetó oportunamente[29], pero no recibió contestación alguna[30], ni se le notificó la decisión

---

[27] Véase el hecho incontrovertido núm. 5, según determinado en la *Resolución* recurrida.
[28] Véase el hecho incontrovertido núm. 6.
[29] Íd.
[30] Véase el hecho incontrovertido núm. 7.

tomada por el Director de Finanzas[31]. Respecto a la segunda factura, Platinum la objetó oportunamente[32], sin recibir respuesta[33], contestación[34], o notificación de la decisión tomada sobre su objeción[35]. Por el contrario, transcurridos ocho (8) años después de la objeción de Platinum a la primera factura y dos (2) años y medio desde la objeción a la segunda factura, la ADSEF instó la *Demanda* de epígrafe. Esto es, sin respetar lo establecido en los incisos (B), (C) y (D) del Art. VI del Reglamento Núm. 7564, *supra.* Así, obvió la oportunidad brindada a los deudores de objetar las facturas, recibir una decisión final por escrito, ser notificado del derecho a apelarla, ejercer el derecho a apelar, participar en una vista administrativa, recibir la determinación final de la agencia y construir el expediente administrativo que resultaría de todo ese proceso y en el que tendría que basarse la decisión, en un procedimiento que la propia agencia comenzó bajo el Reglamento Núm. 7564, *supra.*

En defensa de su proceder, la parte recurrida arguye que el Reglamento Núm. 7564, *supra,* no le impide iniciar la reclamación judicial, aunque no se haya emitido una determinación final por escrito, no se le haya dado la oportunidad de "apelar" al deudor, ni se le haya garantizado la correspondiente vista administrativa. Esa interpretación es impermisible. Interpretando el referido Reglamento de forma integral, la facultad de acudir a la vía judicial, delineada en el inciso (E) del Art. VI y detallada en el Art. IX del Reglamento Núm. 7564, *supra,* aplica a aquellas instancias en las que no se opta por el procedimiento administrativo o, una vez culminado, no se logra el cobro de lo debido. La inclusión de ambos caminos en el mismo Artículo obliga a interpretar que coexisten y que, una vez

---

[31] Véase el hecho incontrovertido núm. 8.
[32] Véase el hecho incontrovertido núm. 10.
[33] Íd.
[34] Véase el hecho incontrovertido núm. 11.
[35] Véase el hecho incontrovertido núm. 12.

iniciados, deben ser respetados. Lo contrario, resultaría en un proceder arbitrario.

Más aún, sería impermisible adoptar el argumento de la parte recurrida e interpretar que el Reglamento Núm. 7564, *supra*, permite la arbitrariedad en la aplicación de sus propias disposiciones, facultando a la agencia a escoger el procedimiento administrativo para luego abandonarlo por completo sin aducir razón o justa causa. Ello sería contrario a los principios más básicos de nuestro ordenamiento administrativo, los cuales repudian la aplicación arbitraria o caprichosa de los estatutos.

Por imperativo del debido proceso de ley, las agencias están obligadas a garantizarle ciertos derechos a las partes afectadas en un procedimiento adjudicativo administrativo. Estos son: (1) la notificación adecuada del proceso; (2) un proceso ante un juez imparcial; (3) la oportunidad de ser oído; (4) la oportunidad de contrainterrogar testigos; (5) la oportunidad de examinar la evidencia presentada en su contra; (6) la comparecencia asistida por un abogado; y (7) que la decisión final esté basada en el récord. Al respecto, la ADSEF plantea que, gracias a la acción judicial, a Platinum se le han garantizado todas esas exigencias, incluso más que en el trámite administrativo. A su entender, eso subsana cualquier irregularidad ocurrida ante la agencia. No obstante, si bien es innegable que el procedimiento judicial es más formal que el administrativo y, de ordinario, posee más garantías, no era el que correspondía según el Reglamento Núm. 7564, *supra*, bajo el que la ADSEF inició los esfuerzos para el cobro del dinero objeto de esta acción. La disponibilidad de mayores garantías mediante el procedimiento judicial no revive la jurisdicción de los tribunales ante su previa ausencia. Lo contrario motivaría la preterición del procedimiento administrativo sin más, toda vez que, ordinariamente, la acción judicial poseerá salvaguardas superiores.

Más aún, la parte recurrida tampoco adujo razón alguna de peso para abandonar el procedimiento administrativo ya encausado por ella misma sin proveerle a la parte involucrada lo garantizado en el referido Reglamento.

En sintonía con lo precedente, según establece la jurisprudencia evaluada, las agencias administrativas están obligadas a observar <u>estrictamente</u> las reglas y los reglamentos que promulgan, quedando limitada su jurisdicción y campo de acción y careciendo de discreción para cumplir o reconocer los derechos contenidos en ellas. Ello implica que, una vez adoptado un reglamento, deben cumplirlo y aplicarlo, sin poder actuar de manera arbitraria o caprichosa, cambiar los reglamentos o establecer reglas nuevas. Igualmente, en nuestro andamiaje administrativo se impide, como regla general, que los tribunales asumamos jurisdicción cuando una parte acude a nuestras puertas sin antes agotarse los remedios disponibles a nivel de la agencia, o cuando se le delega a una agencia la jurisdicción primaria, sea concurrente o exclusiva, de adjudicar una materia.

En contraste, la ADSEF aduce que corresponde que esta Curia le releve de su obligación de agotar los remedios administrativos que comenzó y, en consecuencia, le reconozca jurisdicción sobre el caso a los tribunales, en esta etapa de los procedimientos. Para así proceder, este caso tendría que presentar alguna de las excepciones que permiten preterir la doctrina de agotamiento de remedios administrativos. Sin embargo, ninguna está presente.

Al respecto, la ADSEF nos intenta persuadir de que este caso, por involucrar fondos públicos cobrados indebidamente, está revestido de alto interés público y, por eso, podía optar por la acción judicial y no el procedimiento administrativo ya iniciado. Por ello, arguye que, de eximírsele de la obligación de agotar los remedios

administrativos, se le causaría un daño irreparable al interés público de protección al erario. Ahora bien, aunque los tribunales –así como la jurisprudencia - son empáticos con el alto interés público que acompaña la utilización correcta de fondos públicos en nuestra jurisdicción, la demora y la dejadez de la parte recurrida en proseguir el cobro de esta deuda, de forma diligente, operan en contra de ese argumento. Como señala en su escrito, el alegado cobro indebido en este caso ocurrió **entre octubre de 2010 y septiembre de 2011**. Es decir, más de doce (12) años antes de la presentación de la *Demanda*. La primera factura fue enviada el 20 de noviembre de 2015, poco más de ocho (8) años antes. La segunda factura fue remitida el 14 de noviembre de 2017, poco más de seis (6) años antes. A ambas, Platinum objetó sin recibir respuesta o decisión alguna. Ese proceder no refleja el alto interés público que arguye la ADSEF. Visto así, el requerir el agotamiento de remedios no representaría un daño irreparable, ni sería injustificado ante un balance de intereses.

Por lo contrario, el remedio administrativo sería adecuado y se vería bien servido por la pericia y la flexibilidad adjudicativa administrativa, así como la creación de un expediente en el que se base la determinación final de la agencia. En este caso, según describió la ADSEF, el acto de Platinum que provocó el alegado cobro de lo indebido consistió en que no restó 457 participantes del total de casos activos e incluyó 455 adicionales a los indicados por la agencia, lo cual provocó un pago en exceso de $75,997.00 por 912 participantes durante el periodo de 1 de octubre de 2010 al 30 de septiembre de 2011. La atención de esa alegación se beneficiaría de un procedimiento administrativo ante la agencia con la pericia para examinar si correspondía incluir a una persona en el programa en cuestión, así como para poseer la información pertinente al periodo de tiempo envuelto, ocurrido hace casi trece (13) años. Excepto en

ciertas circunstancias, los tribunales no podemos asumir la tarea de adjudicación cuando no se han terminado los procedimientos administrativos a nivel de la agencia.

Por otra parte, la demora y la dejadez de la ADSEF en proseguir el cobro de esta deuda es la misma desidia y negligencia que la doctrina de incuria penaliza. Esta doctrina justifica que, cuando aplique, no se provea el remedio solicitado mediante reclamos tardíos, como en este caso. Y es que su razón de ser busca proteger al que ejerce el reclamo de sus derechos y no a quien "duerme [...] sin mostrar excusas razonables para ello". ***Alonso Piñero v. UNDARE, Inc.,*** supra. Así, la jurisprudencia obliga a considerar, caso a caso, si existe alguna justificación para la demora, si acarrea algún perjuicio y qué efecto tiene sobre los intereses privados o públicos involucrados. De acuerdo con lo pormenorizado previamente, resulta evidente que la ADSEF no presentó justificación para la dilación, su proceder implicó perjuicio para la parte peticionaria, teniendo un efecto nocivo sobre sus intereses privados y, cómo no, sobre el interés público. Sobre esto último, cabe recordar que, así como puntualiza la ADSEF, una buena, sana y recta administración pública requiere que el Gobierno invierta sus recursos de forma **adecuada, responsable y eficiente**, ejerciendo como contratante la mayor eficacia para proteger los intereses y el dinero del pueblo.

Además, tampoco surge del expediente que Platinum haya contribuido a la dilación en la atención de este asunto por la ADSEF, a quien más debería interesar la satisfacción de la alegada deuda. Lejos de eso, la parte peticionaria ejerció, oportunamente, sus derechos bajo el Reglamento Núm. 7564, *supra*, al objetar ambas facturas y aguardó en vano por una determinación de la parte recurrida o por el señalamiento de la correspondiente vista administrativa. Respecto a este particular, la ADSEF responsabiliza

incorrectamente a Platinum, alegando que no realizó trámite adicional alguno para proseguir el caso a nivel administrativo. La carga de impulsar el caso le correspondía a la agencia, especialmente ante las objeciones de la parte peticionaria. Por esa razón, ese argumento también es improcedente.

Por último, no se debe soslayar que el TPI, al rechazar la *Moción en solicitud de sentencia sumaria* de Platinum, <u>omitió precisar los hechos que estaban en controversia</u> y que le impedían resolver sumariamente el caso. De esta forma, también incumplió con la normativa impuesta a los tribunales por la Regla 36.4 de Procedimiento Civil, *supra*. Nuestro más alto foro ha prescrito que la consecuencia de ese incumplimiento es la revocación de la determinación. Todavía más, según los hechos que encontró incontrovertidos, surge como interrogante qué controversia faltaba por decidir, sin que la *Resolución* recurrida ofrezca respuesta. En contraste, esos hechos incontrovertidos, según determinados, apoyan palmariamente la conclusión de la presente *Sentencia*: la ADSEF no cumplió con su propia reglamentación, no adujo razón o justa causa para ello y, al así hacerlo, atentó contra las nociones más básicas de debido proceso de ley y equidad.

Por todo lo anterior, resulta menester intervenir porque la disposición de la *Resolución* recurrida es contraria a derecho, el asunto se presenta en la etapa más propicia para su consideración y, ante las particularidades evaluadas, su atención evitaría un fracaso de la justicia. Por lo cual, procede expedir el auto de *certiorari* y, por los fundamentos pormenorizados, revocar la determinación recurrida. A esos efectos, corresponde ordenar la desestimación de la *Demanda* promovida por la ADSEF y continuar en el trámite administrativo que la propia agencia comenzó. Los esfuerzos de cobro de la deuda alegada en este caso deberán cumplir con el curso delineado en el Reglamento Núm. 7564, *supra*,

esbozado en esta *Sentencia,* hasta culminar con el proceso por la agencia.

**V.**

Por los fundamentos pormenorizados, se *expide* el auto de *certiorari* y se *revoca* la *Resolución* recurrida. En su lugar, se *desestima* la *Demanda* por falta de jurisdicción. Se ordena continuar con el trámite administrativo comenzado.

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones